UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JON ROBERT ADAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 2:17-cv-00357-JAW |
| | ) | |
| PENNY BAILEY, GLEAN BROWN, and | ) | |
| SCOTT McCAFFERY, | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION FOR SUMMARY JUDGMENT

Pursuant to F. R. Civ. P. 56(a) and Local Rule 7(a), defendants submit this motion for summary judgment. As grounds therefor, defendants state that there are no issues of material fact and that defendants are entitled to judgment as a matter of law. More specifically, defendants state that, on the evidence of record, defendants were not deliberately indifferent to a known, significant risk that plaintiff would be injured in an altercation with another prisoner on March 31, 2015.

### Memorandum in Support of Motion

### Facts and Procedural Background

At the time of the events alleged in the Complaint, plaintiff Jon Adams was a prisoner incarcerated at the Maine Correctional Center (MCC), having started a two year sentence there on March 11, 2014. (Complaint, § IV, ¶ 1.) Adams was initially placed in Unit II at MCC but was moved to Unit I for placement in a substance abuse program ((the Correctional Recovery Academy, or "CRA") about two months after he arrived.

At that time, defendant Penny Bailey was the Unit Manager for Unit I at MCC. According to her affidavit, Adams' behavior was problematic and included discipline for

1

throwing a milk crate filled with cleaning supplies, being out of place, not following orders and refusing to lock in.  Staff also reported that Adams may have been threatening other prisoners. In a meeting, Adams admitted that he may have made threatening remarks (e.g., "I'm going to stick you.") to other prisoners.  Despite these problems, the Unit Team decided to allow Adams to remain in the CRA program.

Less than two months later, Adams was removed from the CRA for threatening to fight and kill another prisoner.  After being placed in segregation, he was returned to Unit II.  It was later reported to Bailey by the Unit II manager that Adams had been recommended for transfer back to Unit I due to threatening other prisoners, even after being told to stop, and due to a belief that he had tried to set up his cell mate by planting a shank under his pillow.

Adams was placed in the Structured Living Unit (SLU) after returning to Unit I.  In response to his frequent complaints about other prisoners calling Adams names, Bailey explained to him the difference between name-calling and actual threats and counselled him on how best to react to name-calling.  Adams did not identify any prisoner who was calling him names.  Bailey asked staff if they were aware of any threats against Adams, and they said they were not.

Around the beginning of 2015, Bailey was told that Adams had been placed in segregation for his own safety after another prisoner overheard him giving information to a staff member about other prisoners.  Bailey advised Adams not to act like an informant in front of other prisoners and also told him she did not want his so-called informant information, as it never turned out to be valid.

After being released from segregation, Adams returned to Unit I.  In February, 2015 he reported to an officer that he had been threatened but, when he was interviewed, he retracted that statement and said he did not fear for his safety.  During February, Bailey received reports from

2

staff that Adams had been upset about name-calling but that, after they spoke with him, he calmed down and said everything was "okay" or "much better."

On March 31, 2015, Bailey received a report that Adams and another prisoner had been fighting and that both had been placed in segregation. When Bailey spoke with Adams a few days later, Adams told her that the other prisoner had been eyeing some paperwork Adams had spread out on a table in a common area; Adams had said something to the prisoner and then followed him back to his cell to apologize when the other prisoner attacked him. The other prisoner reported a similar version, except he said that Adams had stood in his cell door and threatened him and that he needed to fight his way out of the cell to protect himself.

Bailey was aware that Adams had requested to be placed in the Protective Custody Unit. Bailey never believed that there was a risk to Adams that would warrant his placement in P.C. Adams' admission to Bailey that he had threatened other prisoners made P.C. out of the question.

At the time Adams arrived at MCC, Shawn Emerson was the Unit Manager in the Multipurpose Unit (MPU), where Adams was first housed awaiting classification. Emerson avers that Adams is a large man, weighing over 200 pounds, and that he started "running the show" in the MPU by threatening other prisoners housed there.

Adams had several conversations with Emerson about Adams' desire to be housed in P.C. Although Adams said he was being threatened, he never identified anyone who actually threatened him. He also told Emerson that he wanted to be in P.C. because of the "comforts" prisoners there had. For these reasons, Emerson did not believe Adams qualified for placement in P.C. Also, because of his history of intimidating other prisoners, Adams would likely have been able to do the same or worse in P.C., which houses the prison's most vulnerable prisoners.

Adams was moved out of the MPU when he was classified and as soon as a bed became available in Unit II. Approximately a year later, Adams was returned to segregation (which is in the MPU) after he reported being assaulted by another prisoner. At that time, Emerson still did not think P.C. placement was appropriate for him, for the same reasons as before. Also, he had lived safely in general population for over a year and it was reported to Emerson that Adams had provoked the prisoner who assaulted him.

Defendant Scott McCaffery, the Department's classification director, received a letter from plaintiff dated November 3, 2014, requesting that McCaffery approve a transfer from MCC to the Cumberland County Jail. Although Adams stated that he was having "problems and struggles" at MCC and that he was being "challenged and provoked," McCaffery did not understand the letter to mean that Adams felt threatened with serious harm from another prisoner. Adams did not identify and particular threats that had been made against him, nor did he identify any prisoners who had threatened him.

In his Complaint, Adams claims that he filed a grievance with Deputy Warden Glean Brown, although he does not specify what was stated in the grievance. The Complaint refers to this document as Exhibit A, but no exhibit was filed with the Complaint in this case. The Complaint in Adams' previously filed case (which was dismissed for failure to prosecute), does contain an Exhibit A that fits this description. As established by defendant Brown's affidavit, he never received a copy of this grievance and had not seen it before it was sent to him in connection with this litigation. If the document were sent via the prison mail system (as it indicates), it would likely have been routed to the prison's Grievance Review Officer.

**Argument**

**On the facts established in the record, defendants were not deliberately indifferent to a known, serious risk that plaintiff would be assaulted.**

Although prison officials have a duty to take reasonable measures to protect the safety of inmates, *Farmer v. Brennan*, 511 U.S. 825, 832 (1994), not every injury suffered by a prisoner at the hands of a fellow inmate gives rise to a claim under the Eighth Amendment. *Id.* at 834. In order to state a claim for violation of his constitutional rights under the Eighth Amendment resulting from the failure of prison officials to protect him from assault by another inmate, the plaintiff must meet two conditions. First, he must show that he was incarcerated under conditions posing a substantial risk of serious harm. Secondly, he must show that prison officials subjectively appreciated the risk to the inmate and disregarded it. *Giroux v. Somerset County*, 178 F. 3d 28, 31-32 (1st Cir. 1999); *c.f., Burrell v. Hampshire County*, 307 F.3d 1, 8 (1st Cir. 2002) (The "deliberate" part of the deliberate indifference test requires an actual, subjective appreciation of the risk of harm.)

Even where the evidence supported prisoners' claim that they were wary of retaliation and were receiving "heat" from other prisoners for performing security maintenance work, this did not establish that prison officials' refusal to assign them to different jobs was unreasonable. *Brown v. Corsini*, 657 F. Supp. 2d 296, 306 (D. Mass. 2009); *c.f.*, *Oliver v. Vose*, 1991 WL 97453, *2 (D. Mass. 1991) ("The mere fact that plaintiff was afraid of all former federal inmates does not require defendants to provide protection."); *Mosher v. Nelson,* 589 F. 3d 488, 495, f.n. 5 (1st Cir. 2009) (specific information and warnings about inmates are components of overall circumstances that contribute to determination of deliberate indifference.).

In this case, although plaintiff claims that he was harassed, called names and threatened by other prisoners, he does not allege any facts that contradict the evidence in the affidavits of Penny Bailey and Shawn Emerson that plaintiff did not identify any specific threat or specific prisoner who was threatening him.  To the contrary, it was the impression of defendant Bailey that plaintiff himself, through his provocation of other prisoners, was the prime source of any threats he may have received.  Although plaintiff claims he was ill-at-ease when placed in general population units of MCC, there is no evidence that supports the conclusion that defendant Bailey was actually aware of a serious, imminent threat of significant harm to the plaintiff.

Moreover, the nature of the alleged "assault" that occurred on March 31, 2015 is such that it could not have been anticipated given the information available to Bailey.  Plaintiff's claim that defendants were subjectively aware of a risk to him is based entirely on his complaints of being called a "snitch" or "rat" by other prisoners.  The incident giving rise to the alleged "assault," however, had nothing to do with these allegations.  Rather, according to both prisoners involved, the altercation took place after the other prisoner was looking at paperwork that plaintiff had laid out on a table and plaintiff apparently became upset by this.  There is no indication that the fight had anything to do with plaintiff's allegedly perceived status as an informant. Nor is there any allegation of a history of hostility between the two prisoners.

Similarly, Bailey's refusal to place plaintiff in protective custody was reasonable and does not demonstrate deliberate indifference to his safety.  There is evidence that plaintiff only requested P.C. because of the relative "comforts" afforded prisoners there.  His own behavior in threatening other prisoners and "running the show" in his housing unit made placement in the

P.C. unit, where he would be housed with the prison's most vulnerable prisoners, an unacceptable option.

The letter that Adams sent to Scott McCaffery was not sufficient to put McCaffery on notice of an imminent threat of serious harm  Adams complained generally about having "problems and struggles" at MCC and being "challenged and provoked."  He also stated that he wanted to move to be closer to his family. He did not state that he felt at risk of being assaulted, nor did he mention any particular prisoner whom he feared.

As to defendant Brown, plaintiff's claim appears to rest entirely on the grievance that he allegedly mailed to Brown in which he stated that he felt at risk if he started to "stick up for myself."  Brown's affidavit establishes that he never received this grievance form; this makes sense, since a grievance deposited in the prison mail system would have been directed to the facility's Grievance Review Officer for review.  There is no evidence that Brown was aware of any threat of harm to the plaintiff.

### Conclusion

For the reasons stated above, defendants request that they be granted summary judgment.

January 18, 2019                                   ___/s/ J James E. Fortin_____
                                                   James E. Fortin
                                                   Assistant Attorney General
                                                   Attorney for Defendants

Office of the Attorney General
Six State House Station
Augusta, ME 04333-0006
(207) 626-8800

CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 18, 2019, he electronically filed the above document with the Clerk of Court using the CM/ECF system. A copy of the above document is also being placed in the mail to the Plaintiff, postage prepaid, at the following address:

Jon Adams
Cumberland County Jail
50 County Way
Portland, ME 04102

Dated: January 18, 2019                      ___/s/ James E. Fortin_____
                                             James E. Fortin\, AAG