UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| JON ROBERT ADAMS, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | 2:17-cv-00357-JAW |
| | ) | |
| SCOTT R. LANDRY, et al. | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION ON DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

In this action, Plaintiff claims Defendants violated his constitutional right to protection against a serious threat posed by another prisoner while he was confined at the Maine Correctional Center. The matter is before the Court on Defendants' Motion for Summary Judgment. (ECF No. 52.) Plaintiff did not file a response to the motion.

Following a review of the record and after consideration of Defendants' arguments, I recommend the Court grant the motion.

**SUMMARY JUDGMENT STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact

reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Perry v. Roy*, 782 F.3d 73, 77 (1st Cir. 2015). If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of the plaintiff's claims, a trial-worthy controversy exists, and summary judgment must be denied as to any supported claim. *Id.* ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)). Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

**SUMMARY JUDGMENT RECORD**

When presented with a summary judgment motion, a court ordinarily considers only the facts included in the parties' statements of material facts, which statements must be supported by citations to evidence of record. Federal Rule of Civil Procedure 56(c) and District of Maine Local Rule 56(b) – (d) require the specific citation to record evidence. In addition, Local Rule 56 establishes the manner by which parties must present their factual statements and the evidence on which the statements depend. A party's pro se status does not relieve the party of the obligation to comply with the court's procedural rules.[1]

---

[1] "[T]he Court is required to maintain a strict neutrality between opposing parties and even though a more forgiving reading may be appropriate for a pro se party in the summary judgment context, it is also true that '[j]udges and magistrate judges who review these filings must be able to rely on procedural rules so as to avoid becoming the lawyer for the unrepresented [party] or devoting an excessive portion of their time to

*Ruiz Rivera v. Riley*, 209 F.3d 24, 27 – 28 & n. 2 (1st Cir. 2000); *Marcello v. Maine*, 489 F. Supp. 2d 70, 77 (D. Me. 2007).

By rule, a party seeking summary judgment must file, in addition to its summary judgment motion, a supporting statement of material facts setting forth each fact in a separately numbered paragraph, with each factual statement followed by a citation to evidence of record that supports the factual statement. D. Me. Loc. R. 56(b). A party opposing a motion for summary judgment must file an opposing statement in which it admits, denies, or qualifies the moving party's statements by reference to each numbered paragraph, with citations to supporting evidence, and in which it may set forth additional facts, in separately numbered paragraphs, with citation to supporting evidence. D. Me. Loc. R. 56(c). If an additional statement is introduced by the non-moving party, the moving party must file a reply statement in which it admits, denies, or qualifies the non-moving party's additional statements by reference to each numbered paragraph, with citations to supporting evidence. D. Me. Loc. R. 56(d).

"Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." D. Me. Loc. R. 56(f). Additionally, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." *Id.* Finally, "[t]he court shall have no independent

---

such cases.'" *United States v. Baxter*, 841 F. Supp. 2d 378, 383 (D. Me. 2012) (quoting *Clarke v. Blais*, 473 F. Supp. 2d 124, 129 (D. Me. 2007)).

duty to search or consider any part of the record not specifically referenced in the parties' separate statement of facts." *Id.*

Nevertheless, the factual assertions contained in the verified pleadings and affidavits filed by a pro se litigant generally will be considered in the review of a summary judgment motion. That is, where a pro se litigant has failed to comply strictly with the summary judgment rules, this Court has considered the sworn assertions of record. *See Clarke v. Blais*, 473 F. Supp. 2d 124, 128 – 30 (D. Me. 2007) ("The First Circuit has not addressed this notice debate directly, but has said, in the summary judgment context, that unrepresented plaintiffs' opposing affidavits and opposition papers are to be read 'liberally.'" (citing *Posadas de Puerto Rico, Inc. v. Radin*, 856 F.2d 399, 401 (1st Cir. 1988), and *Mas Marques v. Digital Equip. Corp.*, 637 F.2d 24, 27 (1st Cir. 1980)); *Demmons v. Tritch*, 484 F. Supp. 2d 177, 182 – 83 (D. Me. 2007). Plaintiff filed a verified complaint in this matter. (Complaint, ECF No. 1.)

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. Arrival and Dormitory Six

On March 11, 2014, Plaintiff began serving a two-year sentence at the Maine Correctional Center (MCC). (Complaint § IV ¶ 1, ECF No. 1; Defendant's second Statement of Material Fact ¶ 1, ECF No. 53, hereinafter DSSMF.) For intake and classification purposes, Plaintiff was assigned to the Multi-Purpose Unit (MPU). (*Id.* ¶ 4.)

---

[2] The following facts are drawn primarily from Defendants' statement of material facts. (ECF No. 53.) Plaintiff did not file a response to Defendants' factual statements. Accordingly, given the failure to respond, Plaintiff's ability to contest any of Defendants' factual assertions is limited to statements contained in his prior filings, which Plaintiff signed under penalty of perjury.

4

At the end of March 2014, Plaintiff was moved to Dormitory Six. (*Id.* ¶ 5.) Because this incarceration was not the first time Plaintiff had been incarcerated at MCC, he was well-known within the prison population. (Complaint § IV ¶ 2.) Plaintiff had a reputation within the prisoner population as an "informant." (*Id.* ¶ 3.) At MCC, other prisoners insulted Plaintiff and Plaintiff considered some of the comments to be threats of bodily harm because of his reputation of being an informant. (*Id.*)

B.     **The Correctional Recovery Academy in Unit One**

On May 5, 2014, Plaintiff was moved from Dormitory Six to Unit One. (*Id.* ¶ 6; DSSMF ¶ 4.) Unit One contains several general population living areas, including the structured living unit (SLU) and the Correctional Recovery Academy (CRA), which is a substance abuse treatment unit. (DSSMF ¶ 3.) Plaintiff participated in the CRA program, which is a nine-month program. (Complaint § IV ¶ 6.)

Plaintiff had some difficulties in the CRA program and was briefly suspended from the program for throwing a milk crate filled with cleaning supplies. (DSSMF ¶ 5.) Plaintiff was later indefinitely suspended and moved to the segregation unit because he failed to follow staff directives as he was out of place on three occasions and he refused a staff order to lock up. (*Id.* ¶ 6.)

Defendant Bailey, the Unit Manager for Unit One at MCC, received reports that Plaintiff might have threatened other prisoners in the CRA. (*Id.* ¶ 7.) Defendant Bailey met with Plaintiff to discuss the issues that had arisen in the CRA. (*Id.* ¶ 8.) Plaintiff admitted to making statements such as "I'm gonna stick you" to the other prisoners. (*Id.*) Defendant Bailey and the Unit Team decided to let Plaintiff stay in the program. (*Id.*)

5

Shortly after starting the CRA program, other prisoners insulted and threatened Plaintiff, called him a "rat" and other names, and said, "you will get [expletive] up if you start ratting!" (Complaint § IV ¶ 7.) Plaintiff reported this treatment, which he characterized as harassment and as threats, to correctional sergeants and Defendant Bailey. (*Id.* ¶ 8.) Plaintiff asked to leave the CRA program because of the alleged harassment, but Defendant Bailey advised Plaintiff that he should ignore the prisoners who made the statements. (*Id.* ¶ 9.) Plaintiff's difficulties continued, and he asserts he was told he could not leave the program. (*Id.* ¶ 10.)

In September 2014, Plaintiff was removed from the CRA program when a number of prisoners reported that Plaintiff had threatened to fight and kill another prisoner while in the gym. (DSSMF ¶ 9.) Plaintiff claims that he did this deliberately to get terminated from the CRA program so that he could avoid what he perceived to be harassment and threats by other prisoners. (Complaint § IV ¶ 11.)

C.  **Return to Dormitory Six within Unit Two and Transfer to the Structured Living Unit within Unit One**

Upon termination from the CRA program in September 2014, Plaintiff first went to the segregation unit, and then back to Unit Two. (DSSMF ¶ 9.) When Plaintiff arrived in Dormitory Six again, the harassment and threats continued. (Complaint § IV ¶ 12.) Plaintiff made verbal complaints to his Unit Officers and wrote to Defendant McCaffery, Director of Classification at MCC, requesting a transfer back to Cumberland County Jail to finish his sentence there. (*Id.* ¶¶ 12, 15.) Defendant McCaffery denied Plaintiff's request. (*Id.* ¶ 16; DSSMF ¶ 48.) In his letter, Plaintiff wrote that he was having

"problems," "struggles," and was being "challenged and provoked;" Defendant McCaffery did not understand Plaintiff's letter to mean that Plaintiff felt threatened with serious harm from another prisoner. (DSSMF ¶ 46 – 47; ECF No. 53-5.) Plaintiff did not identify any particular threats against him, and Defendant McCaffery understood Plaintiff's request to be motivated by a desire to be closer to his family. (*Id.*)

On or around November 26, 2014, Plaintiff was placed into segregation and was recommended for transfer back to Unit One. (Complaint § IV ¶ 17; DSSMF ¶ 10.) The recommendation was based on Plaintiff's earlier threats that prompted his removal from the CRA program, information that Plaintiff was threatening prisoners in Unit Two, and the suspicion that Plaintiff set up his cellmate by planting a shank under his cellmate's pillow. (DSSMF ¶ 10.) Plaintiff was assigned to the SLU, which is for prisoners with behavioral problems. (*Id.* ¶ 11; Complaint § IV ¶ 17.) When Plaintiff arrived in the SLU, other prisoners yelled out "[Expletive] Rat" and "Rat Bitch," and Plaintiff alleges "the threats of bodily harm continued." (*Id.* ¶ 19.)

Plaintiff asserts he made numerous complaints to Defendant Bailey. (*Id.* ¶ 20 – 21.) Defendant Bailey attempted to explain to him the difference between being called a name and actually being threatened. (DSSMF ¶ 12.) Defendant Bailey also counseled Plaintiff on how to react to name calling, including advising him that if he ignored insults, the insults will eventually stop. (*Id.*; Complaint § IV ¶ 21.) Plaintiff requested placement in Protective Custody Housing, but Defendant Bailey concluded Plaintiff did not qualify for protective custody and thus denied the request. (Complaint § IV ¶ 22 – 23.)

Because Plaintiff did not provide any details about the source of the alleged threats, Defendant Bailey could asked other staff members whether they had witnessed any threats or name calling. (DSSMF ¶ 13.) The other staff members reported that they had not observed any threats; Defendant Bailey reminded them to address threats if they became aware of any. (*Id.*)

In January 2015, Defendant Bailey learned that Plaintiff was placed in the segregation unit for his own safety when he was overheard by another prisoner giving information to staff members about other prisoners. (*Id.* ¶ 14.) Defendant Bailey had instructed Plaintiff several times not to act as an informant in front of other prisoners. (*Id.* ¶ 15.) Defendant Bailey had also told him she did not want his information because it was not reliable. (*Id.*) Plaintiff came back to the SLU within Unit One a few days later, without incident. (*Id.* ¶ 16.)

In February 2015, Plaintiff was moved from the northern half of the SLU to the southern half. (*Id.*; Complaint § IV ¶ 24.) Plaintiff told an officer that he was being threatened, but when interviewed by staff, Plaintiff retracted the statement and said he did not fear for his safety. (*Id.*) Throughout the month, Plaintiff complained to Defendant Bailey and requested protective custody placement, but Defendant Bailey reiterated that Plaintiff did not qualify. (Complaint § IV ¶¶ 27 – 28.) Other staff members reported to Defendant Bailey that Plaintiff had approached them upset about name calling, but the staff members also reported that after they had talked to Plaintiff, he calmed down and later said everything was "okay" or "much better." (DSSMF ¶ 17.)

On March 20, 2015, Plaintiff completed a detailed Prisoner Grievance and sent it to the facility's Senior Deputy Warden of Security, Defendant Brown. (Complaint § IV ¶ 29.) Plaintiff claims he reiterated his safety concerns and requested placement in protective custody. (*Id.* ¶ 30.) Plaintiff asserts the grievance was ignored. (*Id.* ¶ 29.) Defendant Brown maintains he did not receive the grievance[3] and was unaware that Plaintiff felt threatened because Defendant Brown relied on the Unit Manager and Unit Team to respond to such complaints and to determine whether any measures were necessary to address a prisoner's concerns. (DSSMF ¶ 49 – 50.)

**D.     Assault in a Nearby Cell**

On March 31, 2015, Plaintiff and another prisoner were placed in the segregation unit for fighting. (Complaint § IV ¶¶ 31 – 32; DSSMF ¶ 18.) Plaintiff claims he was assaulted, lost consciousness, and suffered head injuries. (*Id.* ¶¶ 31, 34.) On April 1, 2015, Plaintiff submitted a Prisoner Request form to the facility's Criminal Investigator seeking criminal charges against the other prisoner. (*Id.* ¶ 35.) On April 3, 2015, Plaintiff and the other prisoner were removed from segregation and returned to the northern half of the SLU. (*Id.* ¶ 36; DSSMF ¶ 18.)

When Defendant Bailey spoke to Plaintiff about the incident, Plaintiff told her the other prisoner had been looking at some paperwork that Plaintiff had spread out on the table in a common area. (DSSMF ¶ 19.) Plaintiff said something to the other prisoner about it, and then followed the other prisoner back to his cell to apologize, when the other

---

[3] Defendant Brown claims the first time he saw the grievance was in connection with this litigation.

prisoner attacked him. (*Id.*) According to the other prisoner, Plaintiff was angry that the other prisoner was looking at the paperwork on the table. (*Id.*) Plaintiff followed the other prisoner to the other prisoner's cell. (*Id.*) Plaintiff stood in the doorway and threatened him. (*Id.*) The other prisoner believed he needed to fight his way out of his cell in order to protect himself. (*Id.*) Defendant Bailey did not believe the assault had anything to do with Plaintiff acting as an informant. (*Id.* ¶ 21.)

Staff members subsequently arranged mediation between Plaintiff and the other prisoner and that both prisoners said they had no further issue with each other. (*Id.* ¶ 22.) Both prisoners said they would be okay to live in the same housing unit. (*Id.*)

### E. Further Transfers and Requests for Protective Custody

Over the next few weeks, Plaintiff continued to tell security staff that he did not feel safe and continued to request protective custody. (*Id.* ¶ 24 – 26.) Defendant Bailey did not believe there was a risk to Plaintiff's safety that required protective custody, but also did not consider protective custody appropriate in part because Plaintiff's history of threatening other prisoners created a likelihood that Plaintiff would try to control other prisoners in that unit, resulting in a risk to others. (*Id.* ¶ 30 – 40.) Plaintiff previously admitted to another staff member that the "comforts" of protective custody influenced his requests for a placement there. (*Id.* ¶ 39.)

On April 10, 2015, Plaintiff was transferred to C-Pod North within the MPU over his objections. (Complaint § IV ¶¶ 46 – 57.) Plaintiff asserts that "[i]mmediately, [other prisoners] began to yell out threats as the Plaintiff was proceeding to his assigned cell, calling Plaintiff a "rat" and other insults. (*Id.* ¶¶ 59 – 60.) Plaintiff was sent to segregation

shortly thereafter. (*Id.* ¶¶ 61 – 64.) On April 14, 2015, Plaintiff was transferred to C-Pod Center within the MPU and remained there without incident until June 5, 2015, when he was transferred back to the SLU. (*Id.* ¶¶ 65 – 69, 75.)

In July 2015, Defendant Bailey and the Warden met with Plaintiff to discuss his most recent request to be placed in protective custody. (*Id.* ¶ 27.) Plaintiff did not provide any specifics about the alleged harassment, but he gave a few names of the prisoners who were allegedly harassing him; Defendant Bailey asked the staff to monitor the interactions between Plaintiff and the other prisoners. (*Id.*) Plaintiff admitted that often when other prisoners threatened him, it was because he threatened them first. (*Id.*)

Plaintiff had further disciplinary difficulties for making threats; as a result, he was transferred back and forth to segregation on a few occasions. (*Id.* ¶ 26 – 29.) Less than one week before Plaintiff's release from MCC, Defendant Bailey met with Plaintiff and counseled him not to yell things out of his cell. (*Id.* ¶ 29.) Plaintiff was given the choice to remain where he was until release or to return to MPU general population; Plaintiff opted to stay in the northern half of the SLU in Unit I. (*Id.*)

## F. Procedural History and Subsequent Periods of Incarceration

On July 17, 2015, Plaintiff commenced a prior action in which he asserted the same claims he asserts in this action. *Adams v. Landry*, No. 2:15-cv-00282-JAW (Am. Compl., ECF No. 25) (the prior action). Plaintiff was released from custody on September 15, 2015. (Defendants' First Statement of Material Fact ¶ 8, ECF No. 28, hereinafter DFSMF.) On November 27, 2015, Plaintiff advised the Court that he was confined at the Cumberland County Jail, and he requested information regarding the "status of [his] pending suits in

this Court."[4] (Prior Action, ECF No. 36.) On December 7, 2015, Plaintiff informed the Court that he was soon to be released to a rehabilitation center in Auburn, Maine, and he provided the address of the center. (Prior Action, ECF No. 37.)

In January 2016, the United States Postal Service returned to the Court mail the Court sent to Plaintiff. The Postal Service stamped the envelopes "not deliverable as addressed, unable to forward," and the writing on both envelopes suggested Plaintiff had moved from the rehabilitation center. (Prior Action, ECF Nos. 40, 41.) Plaintiff did not inform the Court of any further change of address or otherwise make filings or communicate with the Court for more than six months. On August 12, 2016, the Court dismissed the prior action without prejudiced based on Plaintiff's failure to prosecute. (Prior Action, ECF Nos. 48, 49.)

On December 8, 2016, Plaintiff was reincarcerated at MCC. (DFSMF ¶ 11.) In June 2017, Plaintiff filed a motion to "refile" or "reopen" the prior action. (Prior Action, ECF No. 51.) The Court denied Plaintiff's request to reopen the case, but noted that Plaintiff could refile the action. (Prior Action, ECF No. 56.)

Plaintiff filed the complaint in this action on September 14, 2017. (ECF No. 1.) Plaintiff was released from custody, and he provided the Court with notice of a new address, which notice the Court docketed on January 2, 2018. (ECF No. 18.) On May 1, 2018, upon a review pursuant to 28 U.S.C. §§ 1915 and 1915A, the Court dismissed four individuals named as defendants in the complaint, leaving as defendants Penny Bailey,

---

[4] Plaintiff's other civil action was *Adams v. Cummings, et al.*, No. 2:15-cv-00370-JAW. On December 8, 2015, the Court dismissed that action after a review pursuant to 28 U.S.C. § 1915 and 28 U.S.C. § 1915A.

Glean Brown, and Scott McCaffery. (Order Affirming Recommended Decision and Addressing Other Motions, ECF No. 19.) When the Court sent Plaintiff copies of its May 2018 decision and related orders, the U.S. Postal Service returned the mail with the notation "return to sender, not deliverable as addressed, unable to forward." (ECF Nos. 24, 25.)

On July 9, 2018, Defendants filed a Motion for Partial Summary Judgment. (ECF No. 27.) In that motion, Defendants reported that after Plaintiff's release from the Maine Correctional Center, Plaintiff violated the terms of his probation, was arrested on or about June 25, 2018, and was confined at the Cumberland County Jail at the time of filing that motion. (*Id.* at 6.) On October 1, 2018, the Court granted the Motion for Partial Summary Judgment regarding Plaintiff's claims for declaratory judgment and negligent supervision. (ECF Nos. 32, 34.)

On January 18, 2019, Defendants filed the Motion for Summary Judgment on the remaining claims against the remaining defendants. (ECF No. 52.). Plaintiff did not respond to the motion.[5]

## DISCUSSION

The Cruel and Unusual Punishment Clause of the Eighth Amendment, as applied to the states through the Fourteenth Amendment, imposes a duty on prison officials to protect inmates from violence at the hands of other inmates. *Lakin v. Barnhart*, 758 F.3d 66, 70 (1st Cir. 2014). "That duty has its origins in the forced dependency of inmates[.]" *Giroux v. Somerset Cty.*, 178 F.3d 28, 31 (1st Cir. 1999). "Having incarcerated 'persons [with]

---

[5] According to the confined inmate list maintained by the Cumberland County Sheriff's Office, *see* http://www.cumberlandso.org/235/Confined-Inmate-List, at that time Plaintiff was scheduled for release on March 7, 2019.

13

demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer v. Brennan*, 511 U.S. 825, 833 (1970) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526 (1984)).

Under the law, however, not every incident of prisoner-on-prisoner violence that results in injury gives rise to constitutional liability. *Lakin*, 758 F.3d at 70. To raise a genuine issue of constitutional liability, a plaintiff must demonstrate that he was "incarcerated under conditions posing a substantial risk of serious harm," and that the defendant "acted, or failed to act, with 'deliberate indifference to inmate health or safety.'" *Id.* (quoting *Farmer*, 511 U.S. at 834). In other words, a plaintiff must satisfy both an objective standard (substantial risk of serious harm) and a subjective standard (deliberate indifference) in order to prove a claim of deliberate indifference. *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014) (en banc). "[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

Plaintiff's remaining claims for money damages against Defendants fail under the objective prong. Plaintiff did not establish a substantial risk of serious harm prior to the assault on March 31, 2015. Plaintiff described repeated insults from other prisoners related to his reputation as an informant. While he might have subjectively interpreted the name calling and other comments as "challenges," "provocations," and threats, they do not,

without more, establish a sufficient risk of serious injury from an objective perspective to create a constitutional deprivation. *See Switzer v. Thomas*, No. 5:12CV00056, 2013 WL 693090, at *5 (W.D. Va. Feb. 25, 2013), recommendation adopted, No. 5:12CV00056, 2013 WL 1145864 (W.D. Va. Mar. 19, 2013) ("his being subjected to 'insults' by fellow inmates . . . without more does not rise to the level of a constitutional violation"); *Smith v. Gant*, No. CV 12-7207 DDP (JCG), 2014 WL 12684168, at *2 (C.D. Cal. June 18, 2014), recommendation adopted, No. CV 12-7207 DDP (JCG), 2015 WL 13239090 (C.D. Cal. Sept. 4, 2015) (rejecting failure to protect claim based on verbal harassment from other prisoners).[6]

Even if the comments from the other prisoners could be construed as presenting a substantial risk of serious bodily injury to Plaintiff, a fact finder could not reasonably infer, on this record, that Defendants subjectively perceived the comments Plaintiff reported as constituting a genuine threat to Plaintiff's safety, and that Defendants chose deliberately to ignore the threat. The record establishes that Defendants perceived the comments as reflecting conflict that is not atypical of the prison environment. Defendants took measures to help Plaintiff respond to the comments and manage the conflict. For instance, when another prisoner observed Plaintiff acting like an informant, Plaintiff was temporarily moved into segregation, which action refutes the inference that Defendants were

---

[6] The only comment Plaintiff mentions in his complaint that could reasonably be construed as a threat was the statement of some prisoner that "You will get [expletive] up if you start ratting!" (Complaint § IV ¶ 7.) This statement cannot reasonably be construed as the basis of a constitutional deprivation because it was made at the start of Plaintiff's CRA program nearly a year before the alleged assault, while Plaintiff was in different housing than the northern Security Building, and Plaintiff did not attribute the comment to any particular prisoner. No reasonable fact finder could find that the comment, without more, constituted a genuine, specific, and credible threat to Plaintiff's safety nearly a year later in a different living situation.

15

unconcerned about Plaintiff's safety. The undisputed evidence establishes that Defendants did not simply dismiss Plaintiff's complaints as unfounded; instead, they monitored Plaintiff's interaction with other prisoners for possible threats, but they did not observe a genuine threat to his safety. Furthermore, Plaintiff never reported to Defendants a credible threat with any level of specificity, despite many opportunities to do so. Under the circumstances, the record does not support a finding that Defendants were subjectively aware of a substantial risk of serious bodily injury and deliberately chose to ignore it.

Finally, even if Plaintiff's reports of prisoner comments were sufficient to establish a substantial risk of serious bodily injury, and even if Plaintiff's nonspecific reports of the comments were sufficient to notify Defendants of that serious risk, Plaintiff's claim for damages resulting from the March 31, 2015 assault fails because the unrebutted evidence establishes that the assault was not the result of that particular risk – i.e., that Plaintiff was in danger because of the perception that he was an informant.

For a constitutional tort claim under § 1983 to succeed there must be "a causal connection" between the defendants' conduct and the Plaintiff's harm. *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 559 (1st Cir. 1989); *see also Scott v. Cote*, No. CIV. 05-81-P-C, 2006 WL 1030119, at *8 (D. Me. Apr. 18, 2006) (an Eighth Amendment failure to protect claim requires plaintiff "to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation") (quoting *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir.1995)). Here, the record establishes that the assault was not the result of Plaintiff's perceived role as an informant. Rather, the assault was the product of an unrelated disagreement between Plaintiff and the

alleged assailant.  Plaintiff, therefore, has not demonstrated that the incident is related to the safety risk about which he allegedly notified Defendants.

In short, viewed in the light most favorable to Plaintiff, the record does not support a violation of Plaintiff's Eighth Amendment rights.

## CONCLUSION

Based on the foregoing analysis, I recommend the Court grant Defendants' Motion for Summary Judgment.  (ECF No. 52.)

## **NOTICE**

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 27th day of March, 2019.